## Engle, et al. v. Wallen, et al.

(Decided June 16, 1925.)

### Appeal from Knott Circuit Court.

1. Fraudulent Conveyances—Fraud Never Presumed.—Fraud is never presumed.
2. Fraudulent Conveyances—Evidence Held to Show Alleged Innocent Purchaser of Land had or was Chargeable with Notice of Fraud of Grantor.—Evidence held to show that alleged innocent purchaser of mineral rights in land had or was chargeable with notice that transfer was fraudulent attempt of grantor to place property in hands of innocent purchaser before deed executed by court commissioner in another suit for specific performance of contract to convey was recorded.

A. J. MAY and J. P. HOBSON for appellants.

J. D. SMITH, A. B. COMBS and SMITH & COMBS for appellees.

OPINION OF THE COURT BY JUDGE MCCANDLESS—
Reversing.

Asserting title to the mineral rights in 121 acres of land lying in Knott county, appellants brought this action to cancel an alleged fraudulent deed conveying the same interest in that tract of land, and executed by Greene Sexton and wife, to W. W. Wallen on the 25th day of July, 1912. The answer traversed the petition and pleaded that defendant was an innocent purchaser for a valuable consideration and without notice. This plea was also traversed.

It appears that in April, 1903, George W. Koons, a resident of Pennsylvania, purchased the mineral rights in this land of Greene Sexton by title bond duly executed and witnessed. This bond was lodged and indexed in the Knott county clerk's office, but not recorded. In September following Koons paid the balance of the purchase money due under the contract in accordance with the bond and Sexton and wife executed and acknowledged a deed therefor, but this was not put to record and Koons returned to Pennsylvania, where he died a few months thereafter. The deed seems to have been misplaced and not knowing of its existence, Koon's heirs, through their attorney, A. J. May, filed a suit in the Floyd circuit court against Sexton, who was a resident of that county, for specific performance of the contract set out in the title bond.

Sexton employed the law firm of Combs and Smith to defend that action. Both of these attorneys had formerly lived at Hindman, in Knott county, but Combs had moved to Prestonsburg and the firm had offices in both towns. Combs informed Sexton that he could make no defense to the action, but advised him to have no conversation with A. J. May. No defense being made default judgment was rendered and in accordance therewith the master commissioner of the Floyd circuit court executed a deed of conveyance of the mineral rights in the land to Koons' heirs. The term of court at which this was done adjourned just before the opening of the Knott circuit court and Combs at once went to the latter place. On his way he stopped by to see Sexton and informed him that Jack May had beaten them in the law suit but that the way to beat May was to find an innocent purchaser over at Hindman to buy the mineral rights before May lodged the deed for record, which he would not likely do until he, May, came over to attend the Knott

circuit court. Sexton agreed to this and told Combs to attend to it for him. Sexton went to the home of his father-in-law, John Wicker on Sunday following and arranged with him to go to Hindman and keep a lookout to see if Jack May lodged the deed for record.

Combs had a conversation with his law partner, Hillard Smith, on Monday and the latter, who is a brother-in-law of the defendant, Wallen, went to the store in Hindman where Wallen was at work and informed him that he could buy these mineral rights at a reasonable price. Wallen testifies that he was busy at the time and told him he would think about it. Shortly afterward he found time to go to the office of Combs and Smith and had a conversation with Combs in which he says Combs told him that he had the sale of the mineral rights; that he asked Combs if there was anything against it and Combs told him there was not. Combs also told him that Sexton had conveyed the surface to one Chaffin and reserved the mineral rights; that the deed was on record and he could inspect it at the clerk's office. Combs was a capable title lawyer and he relied on his statement that the title was good and considering it a good investment told him that he would take it at $250.00; that Combs said he would telephone for Sexton and his wife to come in and make the deed and he returned to the store. He afterwards inspected the Chaffin deed but does not remember when he did so. On Tuesday morning Combs notified him that Sexton and his wife had arrived and he went to the bank and drew out $250.00 in cash and carried it to Combs and Smith's office. Combs had prepared the deed and it was then executed in the presence of Combs, Smith and John Wicker and possibly some others and he paid the consideration in cash, took the deed and had it recorded. Sunday afternoon previous he went to Jones Fork where he had some property and stayed all night. On the way he met Greene Sexton and talked with him for possibly two minutes; he had a sick headache at the time and the conversation was brief. Sexton asked him if Combs and Smith were in Hindman; he told him that he did not know as to Combs but that Smith was there; nothing was said about the purchase of these mineral rights nor did he know anything at the time about the matter; he stayed all night at that place and on the following morning he saw Greene Sexton and John Wicker passing on horseback but had no conversation with them. Wicker

is his uncle and he is a first cousin of Greene Sexton's wife. He returned Monday morning and all the transactions mentioned above occurred afterward. He knew nothing of the Koons claim or of the suit relative thereto and had no intimation of any controversy in reference thereto or of any defect in Sexton's title and made the purchase in absolute good faith. Since this suit was filed he has sold the property for $2,500.00, of which $1,250.00 was paid in cash and a note executed for the remainder, which has been held pending the determination of this case.

Sexton was a witness for Wallen and with brazen frankness detailed his part in the transaction. He states, however, that on his way to Hindman to execute the deed and while going up Jones Creek he and his wife met Wallen; that it had been raining heavily; the water was deep and surging around their horses and they were hurrying on and only had a few words with Wallen, but that he did ask him about Hillard Smith being in Hindman and told him that he wanted to get Hillard to attend to this suit for him, but disclaimed mentioning anything about the land transaction, indeed he intimates that they were very careful not to let the "innocent purchaser" know anything about the plans or purposes of the sale. On arrival at Combs' office they found the deed already prepared. Wallen was sent for and the deed was executed and Wallen paid him the money. Combs fixed his fee at $5.00, which he paid. He and his wife were wet, but no comment was made or question asked about this, and they left on their return trip within thirty minutes after their arrival.

Wallen denies going out of Hindman on Tuesday and says Sexton is mistaken as to meeting him on that day, and on redirect examination Sexton says it might have been Wallen's brother Dave with whom he talked but admits that he knows Wallen well.

It is strongly argued that whatever may have been the derelictions of Combs and Sexton, that no wrongdoing is attributable to Wallen and no notice brought home to him of the fraudulent scheme by which they procured a purchaser, and that while suspicion may be aroused, fraud cannot be presumed against him.

It is true that fraud is never presumed and it may be true that Wallen is a man of character and that he enjoys the unique distinction of being a fortunate victim of the wiles of others, but if so, he is quite unfortunate

in his family relations and in the selection of his business intimates. It does not appear that Combs sought any other "innocent purchaser," and it does appear that he experienced neither difficulty nor delay in dealing with Wallen. Viewed in this light his confident assurance to Sexton that he would find such purchaser seems an almost uncanny prescience, though this might have come about naturally.

If the deal was not mentioned to Wallen until Monday morning his meeting with Sexton on Sunday afternoon and seeing him and John Wicker as they passed his place on Monday morning may have been a mere coincidence, though it is a little singular that so voluble a person as Sexton is, did not mention the matter to his kinsman, as the purpose of his trip was to procure his father-in-law to assist in finding an *innocent* purchaser. The meeting with Sexton and his wife in Jones fork Tuesday morning was more significant. At that time Wallen had agreed to take the property and knew that Sexton was the seller; that Combs had telephoned for them to come and that their purpose was to make the deed. Less than twenty-four hours had elapsed and in spite of rain and flood Sexton and his wife were hurrying on, evidencing by their precipitate haste that their business was urgent and brooked no delay. They were his kinspeople, doubtless he was acquainted with their character and the most natural thing in the world would have been to ask them about the property he was purchasing and the condition of the title; and that some inquiry would have been made when he met them reeking wet in Combs' office, paid the consideration in cash and without inquiry accepted the deed, had it recorded and saw them immediately depart, all without comment. Singular to say the astute lawyers only charged Greene Sexton $5.00 for their entire services. It is a matter of speculation whether they were devoting their services to philanthropy or were looking elsewhere for reward. Is it beyond the bounds of probability that a purchaser labelled "innocent" by Combs, in this transaction, would supplement the $5.00? But leaving out any inference that may be drawn from this circumstance, the atmosphere of the case is murky and saturated with fraud; the studied innocence of the purchaser is overdone. Though he closed his mouth he could not be unaware of the matters transpiring before his eyes, the precipitate haste of the sellers and their desperate efforts to conclude the deal without delay could not have escaped his attention, and

this taken in connection with the apparently inadequate consideration paid was sufficient to put him on inquiry, and in view of the close relationship existing between all the parties it is evident that Wallen either learned of the situation or refrained from further inquiry to avoid information, which would be equivalent to notice.

It may be said that he denies the meeting in Jones fork and that on redirect examination Greene Sexton says that he may have been mistaken in that man; that he might have been defendant's brother, Dave, but it is entirely unreasonable that he could have made this mistake between men with whom it appears he was well acquainted, and if such had been the case it is likely that astute counsel would have had Dave's testimony or accounted for its absence. Counsel also argue that $250.00 was the full value of the land at the time of purchase, but that a railroad was later constructed in the vicinity and that thereby the value was enchanced to $2,500.00. This is plausible, but it is not disclosed by the record, and on the whole case we are of the opinion that under the evidence Wallen was chargeable with notice of the fraudulent character of the transaction and that the court should have cancelled the deed.

Wallen's vendees are not parties to the record and we may not determine whether or not they had notice, actual or constructive of this proceeding, hence their rights are not determined. The appellants were entitled to the relief sought in their petition.

The judgment of the lower court being otherwise it is reversed and cause remanded for proceedings consistent with this opinion.